UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :

                                            :    Hon. Madeline Cox Arleo

v.                                :

                                            :    Criminal No. 14-220

COREY HAMLET et al.               :

SUR-REPLY OF THE UNITED STATES OF AMERICA IN FURTHER OPPOSITION
TO DEFENDANT LATEEF GRIMSLEY'S PRETRIAL MOTIONS

                                       WILLIAM E. FITZPATRICK
                                       ACTING UNITED STATES ATTORNEY
                                       970 Broad Street
                                       Newark, New Jersey 07102
                                       (973) 645-2700

On the Brief:

BARRY A. KAMAR
OSMAR J. BENVENUTO
Assistant United States Attorneys

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES.................................................................................iii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................... 3

ARGUMENT ................................................................................................. 5

A.    Grimsley Had No Reasonable Expectation of Privacy In 707 Broadway At The Time of The Search........................................... 5

B.    Under *Kentucky v. King*, the DEA Did Not Need Probable Cause To Conduct A Knock-And-Talk ........................................ 8

C.    There Was Probable Cause To Conduct A Protective Sweep of 707 Broadway............................................................11

CONCLUSION ..................................................................................... 17

## TABLE OF AUTHORITIES

**PAGE(S)**

*Illinois v. Gates,*
   462 U.S. 213 (1983) ............................................................... 13, 15

*Kentucky v. King,*
   563 U.S. 452 (2011) ............................................................. *passim*

*Minnesota v. Carter,*
   525 U.S. 83 (1998) ................................................................... 5, 6

*Minnesota v. Olson,*
   495 U.S. 91 (1990) ...................................................................... 6

*Schneckloth v. Bustamonte,*
   412 U.S. 218 (1973) .................................................................. 10

*United States v. Agnew,*
   407 F.3d 193 (3d Cir. 2005) ........................................................ 6

*United States v. Brown,* 3 F.3d 673 (3d Cir. 2000)
   3 F.3d 673 (3d Cir. 1993).......................................................... 15

*United States v. Burton,*
   288 F.3d 91 (3d Cir. 2002) ........................................................ 16

*United States v. Coles,*
   437 F.3d 361 (3d Cir. 2006) ........................................................ 8

*United States v. Eng,*
   571 F. Supp. 2d 239 (D. Mass. 2008) .......................................... 8

*United States v. King,*
   364 Fed. Appx 781 (3d Cir. 2010)................................................ 8

*United States v. MacDonald,*

iii

916 F.2d 766 (2d Cir. 1990) .................................................................. 8, 9

*United States v. Pollard,*
215 F.3d 643 (6th Cir. 2000) ....................................................................... 8

*United States v. Pettiway,*
429 Fed. Appx. 132 (3d Cir. 2011)............................................................... 6

*United States v. Rhiger,*
315 F.3d 1283 (10th Cir. 2003) .................................................................. 8

United *States v. Robertson,*
297 Fed. Appx. 722 (10th Cir. 2008) .......................................................... 6

*United States v. Whitfield,*
634 F.3d 741 (3d Cir. 2010) ..................................................................... 11

iv

The United States of America respectfully submits this sur-reply in further opposition to the pretrial motions of defendant Lateef Grimsley, a/k/a ("Bird") ("Grimsley").  As set forth below, (1) Grimsley does not have standing to challenge the search of the heroin mill located at 707 Broadway, (2) under *Kentucky v. King*, law enforcement officers were entitled to conduct a knock-and-talk—without probable cause—even if such action triggered an exigency; and (3) there was probable cause for law enforcement to conduct a protective sweep of the premises.

## PRELIMINARY STATEMENT

Grimsley filed two incongruous affidavits in support of his motion to suppress the evidence seized from the heroin mill located at 707 Broadway, in Newark ("707 Broadway").  In the first affidavit, Grimsley downplayed any association with 707 Broadway, claiming that he merely "was attempting to visit" the apartment, that he did not have a key to the premises, and that he had not been inside the apartment.  After the Government challenged his standing to suppress the evidence, Grimsley changed his tune, filing a second, "supplemental" affidavit trumpeting his connections to 707 Broadway. Notwithstanding his about-face, Grimsley does not—and cannot—argue that he was either the registered tenant or an overnight guest at 707 Broadway *at the time of the search of the premises*.  Thus, he had no reasonable expectation of privacy in 707 Broadway at the time of the search.

1

Even if Grimsley has standing, under the Supreme Court's decision in *Kentucky v. King*, the DEA was entitled to conduct a so-called knock-and-talk at 707 Broadway—without probable cause—even if such action resulted in an exigency. Indeed, after officers knocked on the front door of 707 Broadway, the occupants of the apartment began to jump out of the rear window, dropping 20 to 30 feet to the ground below. One of them commandeered a car and rammed a police vehicle while trying to escape. Both of those events—the apartment's occupants jumping out of the window and one of them ramming a police vehicle—occurred before agents breached the door to the apartment to conduct the protective sweep. Indeed, those facts, coupled with information from a reliable confidential source that Grimsley was using 707 Broadway as a heroin mill, and the physical surveillance in which the officers saw, among other things, Grimsley trying to enter the apartment (and then flee when he noticed an undercover officer) established probable cause (and an exigency) to justify officers to conduct a limited protective sweep of the apartment.

Because there was probable cause for the protective sweep, the evidence that was seized during that sweep and described in a subsequent search warrant affidavit was not tainted. Accordingly, United States Magistrate Judge Michael A. Hammer properly authorized a search warrant to conduct a more fulsome search of 707 Broadway.

2

## STATEMENT OF FACTS

When Grimsley filed his original motion papers seeking to suppress the evidence seized from 707 Broadway, he included an affidavit that effectively disavowed any association with 707 Broadway.  (Dkt. No. 273.)  He swore that he (1) was merely "attempting to visit 707 Broadway" on the day of the search; (2) had "not gain[ed] entrance to the building that day"; and (3) "did not have a key to access 707 Broadway."  (*Id.* ¶¶ 2, 3, 8.)  Grimsley also acknowledged that he resided in an apartment located at a completely separate location, 44 Oraton Street, and that his diabetes medication was there.  (*Id.* ¶¶ 6, 8.)

After the Government pointed out that Grimsley lacked standing to challenge the search of 707 Broadway, he filed a second affidavit in an apparent "about-face" from the original one.  (Dkt. No. 296.)  Grimsley now claims that he possessed a key to 707 Broadway in the past; that he visited 707 Broadway and spent the night there frequently; that he had the ability to permit entrance to some individuals and to exclude others; and that he had even paid some of the rent.  (*Id.*)  But Grimsley also admitted (1) that he was not the registered tenant of 707 Broadway and (2) that he had surrendered his key to Shakur Billinghurst ("Billinghurst"), the *actual* registered tenant of 707 Broadway.

Grimsley also submitted an affidavit from Billinghurst, who is currently serving a term of imprisonment in a Bureau of Prisons facility for his

3

involvement in the 707 Broadway heroin mill.  Billinghurst does not

corroborate any of Grimsley's claims about possessing a key, paying rent, or

inviting others to the apartment.  *Id.*  Nor does he confirm that Grimsley

received mail at 707 Broadway.  He does note, however, that he and Grimsley

stayed at the apartment only "from time to time."  (*Id.* ¶ 5.)  It is not surprising

that both he and Grimsley stayed at 707 Broadway infrequently, given that the

apartment was practically unfurnished and appeared to be used solely to

package heroin.

On the day of the search of 707 Broadway, Grimsley got only as far as

ringing the doorbell at the front of the building and waiting for someone to let

him in.  When he noticed that the undercover DEA agent was also trying to get

into the apartment, he suspiciously walked away from the building.  He was

detained shortly thereafter.  When law enforcement officers asked Grimsley

who else was inside 707 Broadway, he said that he did not know.  (*See* Decl. of

Special Agent Brian Crowe, attached hereto as Exh. A (hereinafter "Crowe

Decl.") ¶ 8.)  After Grimsley was detained, law enforcement officers attempted

to conduct a so-called "knock-and-talk" at 707 Broadway.  When the officers

knocked on the front door of the apartment and identified themselves, they

heard a commotion inside.  A number of the occupants began to jump from the

rear window of the apartment, dropping 20 to 30 feet to the ground below.  One

of the individuals commandeered a car and used it to ram a police vehicle as he

attempted to flee.  It was only at this point, fearing that there may have been someone still inside the apartment who was destroying evidence, the officers entered the apartment and conducted a limited protective sweep.

Aside from the plastic tables and chairs that had been set up to package heroin, 707 Broadway was practically unfurnished.  (Dkt. No. 274, Exh. D, Search Warrant Aff. ¶ 16; Dkt. No. 279, Decl. of Osmar J. Benvenuto ¶ 2.) Inside one bedroom, there was a lone mattress and box spring, stripped of any bedding, resting against a wall.  (Dkt. No. 274, Exh. D, Search Warrant Aff. ¶ 16.)  There was no other furniture.  (*Id.*)  There was no clothing.  (*Id.*)  Indeed, 707 Broadway did not appear to be lived-in.

After the officers conducted a protective sweep of 707 Broadway, they sought a search warrant to conduct a more fulsome search of the premises. Accordingly, United States Magistrate Judge Michael A. Hammer issued a warrant authorizing the DEA to conduct a full search.  (Dkt. No. 274, Exh. D.)

## ARGUMENT

### A.    Grimsley Had No Reasonable Expectation of Privacy In 707 Broadway At The Time of The Search

In *Minnesota v. Carter*, the Supreme Court held that an overnight guest's reasonable expectation of privacy is extinguished "*when the overnight guest departs the home.*"  525 U.S. 83 (1998) (emphasis added).  Similarly, in *United States v. Pettiway*, the Third Circuit Court of Appeals noted that an overnight

guest in the house of another has a legitimate expectation of privacy "*for as long as they are in the home.*"  429 Fed. Appx. 132, 135 (3d Cir. 2011) (citing *Minnesota v. Olson*, 495 U.S. 91 (1990) (emphasis added)); *United States v. Agnew*, 407 F.3d 193, 196-97 (3d Cir. 2005) (defendant who does not reside or otherwise have a sufficient privacy interest in a particular residential location *at the time of a warrant search* cannot challenge the search).

As an initial matter, Grimsley did not live at 707 Broadway.  Indeed, he concedes that he was not the registered tenant of 707 Broadway, nor did he have a key to the apartment.  Moreover, 707 Broadway clearly appears to have been used solely to transact commercial business, i.e., the packaging and distribution of illegal narcotics.  In fact, Billinghurst, the registered tenant of 707 Broadway concedes that he and Grimsley stayed at 707 Broadway only "from time to time."  For these reasons, Grimsley's claim that he had a reasonable expectation of privacy in 707 Broadway is gravely diminished.  *See Carter*, 525 U.S. at 90-91 (individual does not possess an expectation of privacy to challenge the search of another's property when he or she is present solely for commercial or business reasons); *United States v. Robertson*, 297 Fed. Appx. 722, 726 (10th Cir. 2008) (no reasonable expectation of privacy where defendant was not a registered occupant and the subject premises were used only to manufacture and distribute illegal drugs).

Grimsley claims that he paid some of the rent for 707 Broadway.  But he

does not cite any cases (and the Government cannot find any) to suggest that an individual who pays the rent for an apartment, alone, gives rise to an expectation of privacy.

And although Grimsley claims to have had *historical* connections to 707 Broadway (e.g., he purportedly had a key to the apartment at one point; he purportedly had stayed at the apartment in the past), he had no reasonable expectation of privacy in 707 Broadway *at the time of the search*.  The undisputed evidence is that, on the day of the search, (1) Grimsley was never inside 707 Broadway, (2) he admitted that he did not have a key to 707 Broadway, (3) he was ringing the doorbell waiting for someone to grant him entry into the building; and (4) he did not have clothes or overnight bag to suggest he was planning to stay there overnight.  As he concedes, on the day of the search, he was merely "attempting to visit 707 Broadway" (Dkt. No. 273, ¶ 2).  *See, e.g.*, *United States v. King*, 364 Fed. Appx. at 784 (use of the word "visiting" is inconsistent with the premise that defendant stayed at the subject premises on a consistent basis).  He also told the police when he was detained outside the apartment that he did not know who was inside the apartment. (Exh. A, Crowe Decl. ¶ 8.)

The cases that Grimsley cites are readily distinguishable from the instant matter.  Simply, whereas Grimsley was not even inside 707 Broadway when the agents searched it, in each of the cases upon which he relies, the defendants

were inside the subject premises at the time of the search and they also exhibited behavior clearly suggesting they were long-term guests who had a reasonable expectation of privacy in the premises.  For example, in *United States v. Rhiger*, the defendant had entered the subject premises in the absence of the premise's tenant and retired to a bedroom to take a nap, before federal agents entered.  315 F.3d 1283, 1286 (10th Cir. 2003).  In *United States v. Eng*, the defendant stayed overnight as a guest in the apartment the night before the search and was inside the apartment, dressed in pajamas, when the agents entered.  571 F. Supp. 2d 239, 243 (D. Mass. 2008).  And in *United States v. Pollard*, the defendant answered the front door and admitted undercover officers into the subject premises.  215 F.3d 643, 646 (6th Cir. 2000).  In contrast, Grimsley could not even get past the building's front door of 707 Broadway on the day of the search.

### B. Under *Kentucky v. King*, the DEA Did Not Need Probable Cause To Conduct A Knock-And-Talk

Grimsley claims that the DEA did not have probable cause to knock on the front door of 707 Broadway.[1]  But in *Kentucky v. King*, the Supreme Court made

---

[1] Grimsley also cites *United States v. Coles*, 437 F.3d 361 (3d Cir. 2006), to argue that the officers knocked on the front door of 707 Broadway to create an exigency, because they lacked probable cause. But in *Kentucky v. King*, the Supreme Court made clear that law enforcement officers may conduct a knock-and-talk, even if such action will reasonably result in an exigency.  563 U.S. 452, 464-65 (2011).  In that regard, *King* does overrule (or at least alters) *Coles*.  Notably, in *Coles*, the Third Circuit had expressly disavowed *United States v. MacDonald*, 916 F.2d 766 (2d Cir. 1990) (en banc), where the Second Circuit had adopted a relatively permissive view of the exigent-circumstance doctrine.  *Id.* at 369-70 ("Although *MacDonald* is an *en banc* opinion of the Second Circuit, we are hard-pressed to agree with the

clear that law enforcement officers do not need probable cause to conduct a knock-and-talk.  563 U.S. 452, 464-65 (2011).  The Supreme Court also held that it was improper for courts to fault law enforcement officers for not seeking a search warrant immediately, rather than conducting a knock-and-talk.  *Id.* at 466.  The majority in *King* held that such a rule interferes "with legitimate law enforcement strategies" and went on to list some of those potential strategies:

> *First*, the police may wish to speak with the occupants of a dwelling before deciding whether it is worthwhile to seek authorization for a search. They may think that a short and simple conversation may obviate the need to apply for and execute a warrant.  *See Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  *Second*, the police may want to ask an occupant of the premises for consent to search because doing so is simpler, faster, and less burdensome than applying for a warrant. A consensual search also "may result in considerably less inconvenience" and embarrassment to the occupants than a search conducted pursuant to a warrant. *Ibid.*  *Third*, law enforcement officers may wish to obtain more evidence before submitting what might otherwise be considered a marginal warrant application. Fourth, prosecutors may wish to wait until they acquire evidence that can justify a search that is broader in scope than the search that a judicial officer is likely to authorize based on the evidence then available.  *And finally,* in many cases, law enforcement may not want to execute a search that will disclose the existence of an investigation because doing so may interfere with the acquisition of additional evidence against those already under suspicion or evidence about additional but as yet unknown participants in a

---

majority opinion.").  By contrast, in *King*, the Supreme Court expressly embraced the *MacDonald* standard.  563 U.S. 452, 463-64 (citing *MacDonald* in support of the notion that "[s]ome lower courts have adopted a rule that is similar to the one we recognize today.").

criminal scheme.

563 U.S. at 467 (emphasis added).  Clearly, these proffered strategies contemplate that law enforcement may knock on doors without probable cause.

Here, probable cause was needed only before the officers breached the front door and entered *into* the apartment.[2]  Thus, the events that unfolded after the officers knocked but before they entered the apartment are properly considered part of the probable cause.  Specifically, after the officers knocked on the door, individuals inside the apartment began to jump out of the back window.  One of those individuals rammed a police vehicle in an effort to escape.  As set forth in more detail below, those events, along with the information provided by CS-1, the officers' surveillance, and the identification of Grimsley, clearly established probable cause.  That probable cause, coupled with the exigency that someone remaining inside the apartment might destroy evidence, justified the officers' entrance into the apartment to conduct a protective sweep.

---

[2] Grimsley apparently misunderstands the Government's reliance on *King* to prove this point.  The Government never argued that *King* obviated the need for probable cause prior to entering a location to perform a protective sweep.  Rather *King* demonstrates:  (1) Grimsley is wrong when he claims that the Government needed probable cause to "knock and talk" and (2) that the events occurring after the knock but before the entry are properly considered in determining probable cause.

### C.  There Was Probable Cause To Conduct A Protective Sweep of 707 Broadway

Law enforcement officers obtained a search warrant to conduct a full search of 707 Broadway.  Grimsley apparently concedes, as he must, that the affidavit in support of the search warrant established probable cause for the issuance of the search warrant.   However, Grimsley argues that the protective sweep conducted before obtaining the search warrant was an illegal search and thus any information gained from that protective sweep is the so-called fruit of the poisonous tree.  Grimsley argues that without the "tainted" information, there was no probable cause to authorize the search warrant.   He is wrong. There was probable cause to conduct the protective sweep.  Accordingly, the information obtained as a result of the sweep was not tainted, and therefore the search warrant was properly issued.

Before entering 707 Broadway to conduct a protective sweep, the agents were aware of the following facts[3] establishing probable cause:[4]

1.   On or about a week before November 12, 2013, CS-1 informed law enforcement that Grimsley was operating a heroin mill in the third-

---

[3] The agents who conducted the protective sweep were aware of facts relating to the investigation that were not included in the search warrant affidavit.  The search warrant affidavit clarified that it "did not include every detail of every aspect of the investigation." (Search Warrant Aff. ¶ 3.)

[4] Although multiple officers were conducting surveillance of 707 Broadway from various posts, "the collective knowledge of the investigating officers is measured in determining probable cause."  *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010).

11

floor apartment of 707 Broadway (Dkt. No. 274, Exh. D, Search Warrant Aff. (hereinafter "Search Warrant Aff.") ¶ 5);

2. CS-1 had been a source for law enforcement for at least two months and had provided reliable information to law enforcement in connection with at least one other investigation. (Exhibit A, Crowe Decl. ¶ 5.)  The information that CS-1 provided in that matter was corroborated by independent evidence.[5]  (*Id.*)  Based on this, the officers believed that CS-1 was reliable.  (*Id.*)

3. On or about November 12, 2013, law enforcement conducted surveillance around 707 Broadway and confirmed that a number of people were going to 707 Broadway.  (Search Warrant Aff. ¶ 6.)

4. At least one of these individuals carried a large, canvas bag into 707 Broadway.  (*Id.* ¶ 6.)

5. Law enforcement also observed a minivan, which returned to 707 Broadway multiple times to drop off individuals who then entered into 707 Broadway.  (Exh. A, Crowe Decl. ¶ 7.)

---

[5] At the time that CS-1 provided the information related to 707 Broadway, CS-1 had convictions for simple assault, at least six convictions for distribution of narcotics, and resisting arrest.  (Exh. A, Crowe Decl. ¶ 6.)  Following the search of 707 Broadway, CS-1 sustained two convictions for distribution of narcotics. (*Id.*)

12

6.  Grimsley was one of the individuals who went to 707 Broadway that day.  (Search Warrant Aff. ¶ 7.)

7.  Grimsley rang the front doorbell of the building and waited for someone to answer.  (*Id.*)

8.  An undercover officer had walked up to the front door just before Grimsley arrived.  They stood next to each other for a moment, while Grimsley waited for someone to answer the door.  (*Id.*)

9.  Grimsley suddenly walked away, before anyone answered the door.  (*Id.*)

10.  When officers knocked on the front door of 707 Broadway and identified themselves, they heard a commotion inside 707 Broadway.  (*Id.* ¶ 8.)

11.  The officers observed multiple individuals jumping out of the back window of the apartment, dropping approximately 20 to 30 feet below.  (*Id.* ¶ 8.)

12.  One of the males who jumped from the window of 707 Broadway managed to commandeer a car and used it to ram a DEA vehicle that was blocking his exit.  (*Id.*  ¶ 9.)

Based on these facts, the agents had more than ample probable cause before they entered 707 Broadway.

In the seminal case *Illinois v. Gates,* 462 U.S. 213  (1983), the Supreme

Court found probable cause based on an anonymous letter submitted to law enforcement agents advising them where large quantities of drugs were stored. The Court decided that agents involved in the case sufficiently corroborated the details provided to them in the letter with independent investigation and based their determination to obtain a search warrant on their knowledge of drug trafficking behavior. *Id.* at 243–44. While agreeing that it was important to evaluate an informant's veracity, reliability, and basis of knowledge, the Court rejected the rigid application of strict factors and decided that an informant's statements should be reviewed by a judicial officer within the "totality of the circumstances." *Id.* at 230. The Court instructed that "a deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. The Court specifically disagreed with the Illinois Supreme Court's discounting of the corroborative details as "innocent activity," stating that "innocent behavior frequently will provide the basis for a showing of probable cause" and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of non-criminal acts." *Id.* at 243 n.13.

Here, the agents had more than sufficient probable cause to perform a protective sweep at 707 Broadway.

As an initial matter, the DEA obtained information from CS-1 that Grimsley was operating a heroin mill in the third-floor apartment of 707 Broadway.  The officers who conducted this investigation knew that CS-1 had provided reliable information in the past.  Indeed, the facts established in paragraphs numbered one and two above, alone, provided probable cause to search.  *See United States v. Brown*, 3 F.3d 673 (3d Cir. 2000).

But the agents did not rely on just the confidential source's information. Instead, they gathered additional corroborating information during surveillance before they took any active steps.  (*See*, *supra*, paragraphs 3-6.)  During that surveillance, the officers observed several individuals visiting the apartment. This observation was consistent with the operation of a heroin mill and, therefore, corroborated CS-1's information.[6]  At least one of the men was carrying a canvas bag.  Again, based on the officers' training and experience, this observation was consistent with the operation of a heroin mill (because heroin trafficking operations necessarily involve substantial amounts of heroin and heroin packaging materials).  Thus, CS-1's information was corroborated further.

---

[6] Grimsley's argument that this could have been innocent behavior is beside the point. *See Gates*, 462 U.S. at 243 n.13 ("In making a determination of probable cause, the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of non-criminal acts.").

At one point during the surveillance, Grimsley—who CS-1 had specifically identified as the manager of the heroin mill—appeared at 707 Broadway.  Given the unlikelihood that this purely was a coincidence, CS-1's information became even more reliable.

The officers' suspicions were further heightened when Grimsley retreated, after he appeared to identify an undercover law enforcement officer who also was standing in front of 707 Broadway.[7]

Only after all of this did the officers take the lawful step of approaching and knocking on the publicly-accessible front door of 707 Broadway.  By the time the officers heard the commotion inside the apartment, watched multiple occupants jumping out of the apartment's back window, and had one of their vehicles rammed by one of the fleeing occupants, there was ample corroboration of CS-1's information and probable cause to enter the apartment to conduct a sweep.

Curiously, Grimsley completely ignores these final events, preferring to focus only on the events up until the officers knocked on the door of 707 Broadway.  (Grimsley Reply Br. at 15, 18 ("[T]he Government clearly did not have probable cause when it knocked on the door of 707 Broadway.").)  But the

---

[7] Grimsley protests that the officers did not witness an actual drug transaction or the exchange of money.  But direct evidence of a crime is not required for the issuance of a search warrant.  *See United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002).

16

events that transpired *after* the officers knocked on the door but *before* they entered 707 Broadway plainly are part of the probable cause calculus.  See *Kentucky v. King*, 563 U.S. 452 (2011).  There is no question that, taking these events into consideration, there was probable cause to search 707 Broadway prior to the protective sweep.

## **CONCLUSION**

For all of the foregoing reasons, the Government respectfully requests that the Court deny Grimsley's motion to suppress in its entirety.

Respectfully submitted,

WILLIAM E. FITZPATRICK
Acting United States Attorney


By:   /s/Barry Kamar
BARRY A. KAMAR
OSMAR J. BENVENUTO
Assistant United States Attorneys

Date:  April 7, 2017
Newark, New Jersey

17